Filed 12/18/24  Phanichkul v. Yeng CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| TANACHAI PHANICHKUL,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEVE YENG et al.,<br><br>    Defendants and Appellants. | D083034<br><br><br>(Super. Ct. No. 37-2022-00038444-CU-NP-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

Latham & Watkins, John T. Ryan, Nicole C. Valco, Grant E. Strother, Melissa Arbus Sherry, Brent T. Murphy, and Halle H. Edwards for Defendants and Appellants.

Vivoli Saccuzzo and Michael W. Vivoli for Plaintiff and Respondent.

Defending against a claim of malicious prosecution, four defendants (the defendants)—Steve Yeng, his wife Brittany Yeng, and his brother Scott Yeng (collectively, the Yengs) and Yeng Midas Touch, Inc. (YMT)—filed an anti-SLAPP special motion to strike under Code of Civil Procedure section

425.16.[1]  The trial court denied the motion, and the defendants contend this was error.  In support of this contention they argue the plaintiff, Tanachai Phanichkul, failed to demonstrate a probability that he would prevail in establishing his malicious prosecution claim.  We disagree.  Hence we affirm.

## I.
## Background

This lawsuit is the third of *three* lawsuits arising from a soured business relationship involving Phanichkul and the defendants.

**A.  The Parties and the Circumstances that Led to the Three Lawsuits[2]**

According to the allegations of the complaint in the present lawsuit: Phanichkul is a marketing and branding consultant and entrepreneur who "ma[kes] his living by assisting others to create, develop and exploit their brands for financial gain"; and the Yengs are entrepreneurs who own, co-own, and operate several businesses.

In 2016, Phanichkul began performing marketing and other services for a business—YMT—that Steve and Scott[3] had "formed . . . for the purpose of holding various bars and/or restaurants owned by the Yengs."  During the timeframe in which he was performing such services for YMT, Phanichkul also began discussing with Steve and Brittany the idea of mass producing a

---

[1]  All unspecified statutory references are to the Code of Civil Procedure. SLAPP is the acronym for a strategic lawsuit against public participation.

[2]  Except where otherwise indicated, each statement appearing in part I.A. of this opinion is drawn from the complaint in the present lawsuit. We express no view as to the truth or accuracy of any such statement.

[3]  Because several of the defendants share the last name, we refer to them by their first names.  We do so for the sake of clarity, intending no disrespect.

peanut butter-infused whiskey cocktail that had been developed and become popular at the Yengs' OB Noodle House restaurant. Phanichkul and Steve "agreed to partner in a venture to develop such a product, which ultimately became known as 'Skrewball Whiskey,' " and Phanichkul "was instrumental in developing the Skrewball product and brand."

Eventually, Phanichkul "ceased performing services . . . with YMT[,] electing to instead devote his full-time attention to developing what would become Skrewball Whiskey"; and, "[f]or more than a year, [he] devoted most of his productive working time, energies and talents to the Skrewball Whiskey venture." But, by mid-2018, notwithstanding Phanichkul's "role as one of the co-founders of Skrewball Whiskey," "the Yengs began actively excluding [him] from participating [in] the Skrewball Whiskey venture and . . . ultimately cut him out altogether."

These circumstances led to the initiation of two lawsuits within the span of four weeks in 2019.

**B.     Lawsuit Numbers 1 and 2:  the *Skrewball Action* and the *YMT Action***

In one of the two 2019 lawsuits (*Phanichkul v. Yeng et al.* (Super. Ct. San Diego County, 2022, No. 37-2019-00061380-CU-BC-CTL); the *Skrewball Action*), Phanichkul sued Skrewball, Brittany, and Steve. Based on the

3

allegations of the complaint in the present lawsuit,[4] it would appear that the claim or claims in the *Skrewball Action* were to enforce rights Phanichkul was asserting to a stake in Skrewball.

In the other 2019 lawsuit (*Yeng Midas Touch, Inc. v. Phanichkul* (Super. Ct. San Diego County, 2022, No. 37-2019-00056185-CU-28 BT-CTL); the *YMT Action*), YMT sued Phanichkul, asserting six causes of action—violation of the Comprehensive Computer Data Access and Fraud Act (Pen. Code, § 502), interference with prospective economic advantage, conversion, negligence, breach of contract, and fraud. These causes of action were premised on allegations that Phanichkul had (among other things): falsely held himself out as an agent of YMT and as an owner of the OB Noodle House; obstructed the defendants' access to YMT's Web domain, Web site, social media accounts, and email lists; "unlawfully access[ed] [YMT's] computer data and/or computer systems without authorization, including but not limited to bank accounts, ticketing accounts, and marketing email lists, both during the time of the parties' contract and after the termination of the parties' contract," and "disclosed this information to third parties and used [it] for the[ ] . . . personal benefit" of persons other than the defendants.

The *Skrewball Action* settled; and Phanichkul's complaint was dismissed in May 2022 at his request. But the *YMT Action* proceeded to a

---

4    In the complaint in the present lawsuit, Phanichkul alleges that he "was a legitimate co-founder of Skrewball Whiskey," that he "devoted his time, talents and efforts" to Skrewball Whiskey because he was "promised [an] equity interest in [the company]," and that, in communications with one or more of the defendants, he "made clear he expected to be fairly compensated for his role as one of the co-founders of Skrewball Whiskey." In a notice of related case in the *YMT Action*, he further alleged that Steve caused the *YMT Action* to be filed "purely for tactical reasons . . . and . . . to 'go on the offensive' before Phanichkul could first file [the *Skrewball Action*]."

4

jury verdict—followed by a judgment for Phanichkul, and against YMT, on each of the six causes of action that YMT had asserted.

Post trial, Phanichkul filed a motion for cost of proof sanctions pursuant to section 2033.420, based on YMT having refused to admit certain requests for admissions. The trial court issued an order denying the motion. Phanichkul appealed, and, in an unpublished opinion, we reversed that order and remanded the matter for further proceedings. (See *Yeng Midas Touch, Inc. v. Phanichkul et al.* (Nov. 29, 2023, D080981) [nonpub. opn.].[5])

### C. Lawsuit Number 3: the *Malicious Prosecution Action,* and the Anti-SLAPP Special Motion to Strike

While the appeal in the *YMT Action* was pending, Phanichkul initiated the present lawsuit—against YMT and the Yengs—asserting a single cause of action for malicious prosecution (the *Malicious Prosecution Action*).[6] In the complaint in the *Malicious Prosecution Action*, Phanichkul alleged the matters set forth in part I.A. of this opinion, *ante*. In addition, he alleged: that the defendants "*knew* the allegations [pleaded in the complaint in the *YMT Action*] were factually false"; that they "manufactur[ed] . . . false evidence"; that they purposely "saw to it that [he] was served with the summons and complaint in [the *YMT Action*] on [his] wedding day, knowing it was [his] wedding day"; and that, on multiple occasions, they put him to the trouble of "travel[ing] all the way from Milwaukee, Wisconsin, at great expense and inconvenience," for his deposition, "only to cancel [the]

---

[5]    On our own motion, we take judicial notice of our unpublished decision. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[6]    The parties dispute whether the settlement agreement in the *Skrewball Action* bars the *Malicious Prosecution Action*.; however, that dispute is not at issue on this appeal.

deposition literally the day before it was scheduled to be taken."  Per Phanichkul:

> "Defendants' factual allegations were knowingly asserted without any probable cause to believe they were true, and with actual knowledge that the factual allegations were false and utterly baseless.  Defendants nonetheless asserted the claims in the [*YMT Action*] for the improper purpose of damaging [Phanichkul's] reputation and ability to earn other employment, while also actively misusing the [*YMT Action*] to impose unwarranted legal expense upon [him] in order to, among other things, dissuade [him] from pursuing his meritorious claims in the *Skrewball Action*. Defendants also maliciously prosecuted the [*YMT Action*] for the facially improper purpose of coercing a settlement [in the *Skrewball Action*]."

The defendants responded to the complaint in the *Malicious Prosecution Action* by filing an anti-SLAPP special motion to strike, supported by declarations from Steve, Scott, and two individuals who had performed services for YMT or one of its restaurants.[7]  Each of these declaration discussed aspects of Phanichkul's conduct relating to YMT and/or an entertainment venue it operated, and the two from Steve and Scott each culminated with a statement that:

> "Based on the above information and the knowledge of my brother . . . , YMT initiated a lawsuit against [Phanichkul] . . . .  We believed we had evidence to support the claims asserted in the [*YMT Action*]."

Phanichkul opposed the motion with a declaration of his own.  In this declaration, he too discussed aspects of his conduct relating to YMT.  In addition, he discussed the *YMT Action* and the *Skrewball Action*; and, in so doing, he attested to a pair of admissions by Steve:

---

[7]     The defendants' evidentiary submission also included eight exhibits.

"I filed my *Skrewball* [*Action*] against the Yengs to enforce my rights to my fair share of equity in the Skrewball whiskey venture.  There is no doubt in my mind the Yengs filed the [*YMT Action*] against me preemptively, for the specific purpose of deterring me from enforcing those rights.  I know for a fact the Yengs pursued the [*YMT Action*] against me to deter me from enforcing my rights and to make my litigation costs as high as possible with the hopes I would abandon my [claims] against them.  In fact, Steve Yeng *admitted* that fact to me during discussions held between us when he tried to get me to compromise my rights in the *Skrewball Action*, and he told me they did the same thing to Adam Purcell, another individual who sued the Yengs for cheating him out [of] his rightful interest in the Skrewball venture.  Steve Yeng knew full well the allegations he caused to be filed against me in the [*YMT Action*] were not true and he *admitted* that fact to me as well."  (Second italics added.)

The trial court heard and denied the motion, and the defendants timely appealed.

## II.
## Discussion

This appeal arises at the junction of two bodies of law that each implicate a tension between the societal objectives of inhibiting abusive litigation and fostering meaningful resort to the courts.  We begin our discussion by briefly touching on the broad contours of each of these two bodies of law.

### A.  Malicious Prosecution

Malicious prosecution is a tort comprised of three distinct elements. " ' "[T]o establish . . . malicious prosecution . . . , a plaintiff must demonstrate 'that [a] prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in [the plaintiff's]. . . favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice.' " ' " (*Jackson v. Lara* (2024) 100 Cal.App.5th 337, 343.)

7

"Although the malicious prosecution tort has ancient roots, courts have long recognized that the tort has the potential to impose an undue 'chilling effect' on the ordinary citizen's willingness . . . to bring a civil dispute to court." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872.) As courts and commentators alike have noted, "it is . . . important 'that an individual be free to protect personal rights by resort to the courts without the threat of a countersuit for damages in the event the suit is unsuccessful' [citation], and courts have generally been sensitive to the need to carefully limit tort liability in the context of malicious prosecution of a civil proceeding." (*Id.* at p. 872, fn. 5.) Channeling this sensitivity, the defendants point out that numerous authorities have characterized malicious prosecution as a disfavored cause of action. (See, e.g., *id.* at p. 872 ["the tort has traditionally been regarded as a disfavored cause of action"].)

But of course, "disfavored" does not mean "unavailable," and those same authorities remind us that "it is equally true that 'this convenient phrase should not be employed to defeat a legitimate cause of action. . . . ". . . We should not be led so astray by the notion of a 'disfavored' action as to defeat the established rights of the plaintiff . . . by inventing new limitations on the substantive right, which are without support in principle or authority . . . .' " (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1148 (*Graham*), quoting *Bertero v. National General Corp.* (974) 13 Cal.3d 43, 53 (*Bertero*) and *Jaffe v. Stone* (1941) 18 Cal.2d 146, 159; accord *Zamos v. Stroud* (2004) 32 Cal.4th 958, 966 (*Zamos*).)

## B.    Anti-SLAPP

Just as the above described tension between curbing abuse and chilling access is implicated by the tort of malicious prosecution, so too is it implicated by the anti-SLAPP law and case law interpreting it. Indeed, the Legislature's express purpose in enacting the anti-SLAPP law was to help

8

weed out, in early stages of litigation, meritless causes of action asserted primarily to chill a plaintiff's valid exercise of certain constitutional rights, including resort to the courts.  (See § 425.16, subd. (a); *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 315 (*Club Members*); *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 307; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61.)

To achieve this objective the Legislature created a mechanism—the anti-SLAPP special motion to strike—that courts have interpreted as involving a two-step, burden-shifting process.  (*Club Members, supra*, 45 Cal.4th at pp. 315–316; see also *Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021–1022 (*Geragos*).)  In step one, the defendant must carry the burden of making a prima facie showing that a cause of action alleged in the complaint arises from an act of that defendant that is "in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" (protected activity).  (§ 425.16, subd. (b)(1); accord *Club Members*, at p. 315*; Geragos*, at pp. 1021–1022)  If the defendant succeeds in carrying this burden, then, at step two, the plaintiff must establish "a probability that [he] will prevail on the claim."  (§ 425.16, subd. (b)(1); see also *Club Members*, at p. 316*; Geragos*, at p. 1022.)

### C.   The Issue Presented, and the Interrelationship Between Probable Cause and the Probability of Prevailing

In their briefs, the defendants and Phanichkul have narrowed the scope of the malicious-prosecution and anti-SLAPP matters that are before us.  The defendants have narrowed the scope by making the absence-of-probable-cause element the sole focus of their claim that Phanichkul will be unable to prove malicious prosecution.  And Phanichkul has further narrowed the scope by conceding step one of the two-step anti-SLAPP burden-shifting process.

9

Consequently, this appeal is limited to a step-two analysis, the focus of which is the question: Has Phanichkul carried his burden of proving by competent evidence that he *probably will prevail* in demonstrating that the *YMT Action* was brought *without probable cause*? In considering this question, we apply the de novo standard of review (*Geragos, supra*, 88 Cal.App.5th at p. 1020 ["[w]e review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard"])— taking care to root our probability-of-prevailing analysis in authorities governing anti-SLAPP step two, and our absence-of-probable-cause analysis in authorities governing malicious prosecution.

1. **The Methodology for Determining a Probability of Prevailing in Step Two of an Anti-SLAPP Special Motion to Strike Analysis**

Insofar as demonstrating a probability of prevailing is concerned in the context of anti-SLAPP step two, the bar a plaintiff must clear is low. As many authorities have noted, "[t]he second step of the anti-SLAPP analysis has been described as a summary-judgment-like procedure" (see *Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 784 (*Neurelis*)) in which the threshold for the requisite evidentiary showing by the defense is " 'not high.' " (*Id.* at p. 793.)

> "The court determines whether ' "the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." ' [Citation.] The plaintiff ' "may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence." ' [Citation.] The defendant may submit evidence in support of its motion. [Citation.] However, ' "[t]he court does not weigh evidence or resolve conflicting factual claims." ' [Citation.] Rather,

10

*the court ' "accepts the plaintiff's evidence as true,*[8] *and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." ' "* (*Id.* at p. 784, italics added; see also *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384–385, 396.)

Consequently, even "claims with minimal merit proceed." (*Neurelis,* at p. 793; see also *id.* at p. 784; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)

## 2. The Methodology for Determining Probable Cause in a Malicious Prosecution Analysis

Whereas the anti-SLAPP bar a plaintiff must clear to demonstrate a probability of prevailing is low, the *malicious-prosecution* bar he must clear to demonstrate that his adversary's claims in the prior action lacked probable cause is high. This is because—in keeping with the aforementioned concerns about inhibiting resort to the courts—the defendant's threshold for demonstrating the *presence* of probable cause is low. (See *Neurelis, supra*, 71 Cal.App.5th at p. 800 [" '[p]robable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed' "].)

Indeed, as no small number of courts have stated: " 'A prior action [i]s not initiated without probable cause merely because it [i]s ultimately found to lack merit; [rather,] it [i]s initiated without probable cause only if "all reasonable lawyers" would "agree" that the suit, at the time of filing, was "totally and completely without merit" [based on] . . . "the facts known to the defendant" "at the time the suit was filed." ' " (*Neurelis, supra*,

---

8 Naturally, we do not accept assertions presented in the *guise* of evidence. (See *Neurelis, supra*, 71 Cal.App.5th at p. 804 ["[i]n the SLAPP context, we disregard evidence that is 'argumentative, speculative, impermissible opinion, hearsay, or conclusory' "].)

71 Cal.App.5th at 800, italics omitted.) The presence or absence of probable cause matters, moreover, not only at the time a lawsuit is being initiated, but throughout its prosecution as well. As our Supreme Court has held: "Confining the tort of malicious prosecution to the *initiation* of a suit without probable cause would be . . . without support in authority or in principle." (*Zamos, supra*, 32 Cal.4th at p. 966.) "Malicious prosecution . . . includes continuing to prosecute a lawsuit discovered[, post-initiation,] to lack probable cause." (*Id.* at p. 973.)

### D.   Analysis

Joining the above discussed methodologies together, the question before us is this: (1) Accepting Phanichkul's admissible evidence as true and (2) considering the defendants' admissible evidence only to the extent it refutes Phanichkul's evidence, (3) would all reasonable lawyers—relying on the facts known to the defendants during the pendency of the *YMT Action*— have concluded that that action was totally and completely without merit?

Reviewing the declaration that Phanichkul filed in opposition to the anti-SLAPP special motion to strike, we have no difficulty answering this question in the affirmative. Accepting the admissible statements in

Phanichkul's declaration as true, Steve outright *admitted*[9] that he "knew . . . the allegations he caused to be filed against [Phanichkul] in the [*YMT Action*] were not true."[10] (See *ante*.) The Yengs' declarations certainly contradict this testimony. But they do not *refute* it. And any reasonable lawyer relying on Steve's knowledge that the allegations against Phanichkul were not true would certainly have concluded the *YMT Action* was totally and completely without merit. (See *Bertero, supra*, 13 Cal.3d at p. 55 ["[l]ack of probable cause may be established by proof that the action was commenced despite the initiator's knowledge of the falsity of the claim"]; *Graham, supra*, 72 Cal.App.4th at p. 1153 ["if defendant *knows* that the facts he or she is

---

[9] The admission of a party is evidence of the matter admitted by him. (See, e.g., 1 Witkin, Cal. Evid. (6th ed. 2024) Hearsay, § 99 ["[a]dmissions of a party (including statements and conduct of others admissible against the party [citation]) are received to prove the truth of the assertions; i.e., they constitute affirmative or substantive evidence that the jury or court may believe as against other evidence, including the party's own contrary testimony on the stand"]; *Boogaert v. Occidental Life Ins. Co.* (1983) 150 Cal.App.3d 875, 881 [similar]; Evid. Code, § 1220 ["[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity"]; *Estate of Anderson* (1997) 60 Cal.App.4th 436, 441 ["Evidence Code section 1220 creates an exception to the hearsay rule for an admission by a party"].)

[10] Phanichkul's declaration does not say *when* Steve knew the allegations asserted against Phanichkul in the *YMT Action* were false. But it may be inferred from the context that it was during the pendency of the *YMT* Action.

13

asserting are not true, then defendant's knowledge of facts which would justify initiating suit is zero, and probable cause is nonexistent."].)[11]

Hence, at this early stage of the *Malicious Prosecution Action*, it is simply too soon to conclude that Phanichkul is unlikely to succeed in demonstrating the absence of probable cause.

---

[11] The defendants contend that the order denying cost of proof sanctions (which we reversed) demonstrates the existence of probable cause. They also contend that "[t]he critical facts on which YMT acted when filing its complaint and while prosecuting the YMT [Action] are not reasonably in dispute" and that those facts demonstrate probable cause. But we do not reach these arguments because they are rendered irrelevant by the admission discussed above. Indeed, even if we were to conclude that there was an objectively reasonable evidentiary basis on which one might perceive potential merit in the *YMT Action*, that basis would be overridden by Steve's knowledge that the allegations asserted against Phanichkul in that action were not true. As our Supreme Court stated in *Bertero*:

> "The existence of probable cause is, in part, determined by an objective test—it is ' "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true." ' [Citations.] But if the initiator *knows* that his claim is groundless he cannot have an actual or honest belief in its validity, and he may not escape liability for commencing an action based on such a claim merely because a reasonable man might have believed it was meritorious." (*Bertero, supra*, 13 Cal.3d at p. 55, italics added.)

Because we conclude the defendants' contention about the order denying cost of proof sanctions is irrelevant, we find it unnecessary to consider the three exhibits Phanichkul has asked us to judicially notice in connection with that contention. For this reason, we deny his motion for judicial notice. However, we grant his motion to strike the parenthetical citation in the defendants' opening brief (at page 18) to a Web link leading to information outside the record on appeal.

### III.
### Disposition

The order denying the defendants' anti-SLAPP special motion to strike is affirmed.  Phanichkul is entitled to costs on appeal.


KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


CASTILLO, J.